## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **HALI WOODS, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:15-cv-00493-RDP** |
| | } | |
| **JUDICIAL CORRECTION SERVICES,** | } | |
| **INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant Judicial Correction Services, Inc.'s ("JCS") Motion for Summary Judgment. (Doc. # 181). The Motion has been fully briefed. (Docs. # 183, 192, and 202). For the reasons discussed below, the Motion is due to be granted in part and denied in part.

## I.      The Rule 56 Evidence and the Undisputed Facts[1]

In 2006, the City of Columbiana entered into a contract with JCS under which JCS was to provide probation services to the Columbiana municipal court. (Doc. # 157). Municipal court Judge Mike Atchison first learned of JCS from other municipalities that used JCS's services. (Docs. # 160 at 24, # 158 at 38-40). Joanna Seale, a municipal court magistrate and the court clerk, had also heard about JCS during continuing education programs taken in connection with

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .") (internal quotations omitted). The court views the facts in the light most favorable to the non-moving party. *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012).

her magistrate position. (Doc. # 158 at 37). Seale called Susan Fuqua, a magistrate in Hoover, Alabama, to ask about that court's experience with JCS. (*Id.* at 38-40). The Columbiana municipal court explored using JCS for probation services in an effort to save the municipal court from having to hire another full time employee. (*Id.* at 37).

JCS marketed itself as an offender-paid system which did not charge a municipality any money for its services. (Doc. # 180-31 at 193). It claimed that: (1) it could provide an incentive for probationers to pay their fines at a higher and faster rate, (2) its system increased partial payment rates, and (3) under its system, partial payments averaged eighty to ninety percent of the total fine. (Doc. # 193-2). Offenders placed on probation were generally ordered to pay JCS a one-time $10 set-up fee and $35 for each month of probation. (*See, e.g.*, Doc. # 168 at 16).

## A.    The Contract

The Contract with JCS was signed on behalf of Columbiana by then-Mayor Allan Lowe, and on behalf of JCS by the President of JCS Alabama, Kevin Egan. (Doc. # 183-2). The Contract provides for compensation to JCS of a "[p]robation fee of $35.00 per month" and a "[o]ne-time probationer set-up fee of $10.00." (*Id.* at 5). However, Exhibit A to the Contract provides that, "Probationers who pay their entire fine and Court costs within one week of the sentencing date will not be charged a probation supervision fee by JCS, although they would be responsible for $10 set-up fee." (*Id.* at 3).

Under the Contract, JCS agreed to "supervise all probated cases sentenced by the Court" and "supervise indigent cases when determined by the Court." (*Id.* at 4). JCS agreed to "comply with the Court's ruling in reference to sentencing or possible revocation of probation" and that "[a]ny modification to the original court sentence will be decided by the Court." (*Id.* at 4-5).

On April 15, 2015, Columbiana Mayor Stancil Handley terminated Columbiana's JCS Contract. (Doc. # 157-1 at 58). JCS no longer operates in Alabama. (Doc. # 80).

**B.     JCS Operations in the Columbiana Municipal Court**

Columbiana's municipal court generally held two monthly court sessions. (Doc. # 183-1 at 38, 55). Magistrate Seale sat at a table next to Judge Atchison during court. (Doc. # 183-26 at 1). At the beginning of each court session, Judge Atchison read prepared remarks. (*Id.* at 1, 5-6).[2] The prepared remarks informed defendants, among other things, that they had a right to be represented by counsel and that, if jail was a possible punishment and they were unable to pay for an attorney, one may be appointed. (*Id.* at 2, 5-6). During court, defendants were given a copy of Unified Judicial System form C-44B, Explanation of Rights Plea of Guilty. (*Id.* at 3, 8-9).[3]

Judge Atchison was responsible for investigating a person's ability to pay a fine, and this indigency review was to occur prior to any involvement by JCS. (Docs. # 158 at 93-96, # 158-1 at 53, 74, 93-94). Magistrate Seale gave defendants an affidavit of substantial hardship, another state form, when Judge Atchison told her to do so or when an attorney was appointed at a bond hearing. (Doc. # 183-1 at 96). However, Plaintiffs Woods and Douglas both testified that they told Judge Atchison that they were unable to pay the fines he imposed, but he nonetheless imposed the fines and referred them to JCS. (Docs. # 183-8 at 54-55, 86, 212-14, # 183-27 at 71, 75-76, # 193-4, # 193-5). Magistrate Seale testified that, if a defendant could not pay a fine in full, the normal procedure was to sentence them to either probation with JCS or to jail. (Doc.

---

[2] Although Plaintiffs' counsel disputed this fact, the cited testimony does not establish that Judge Atchison did not follow this procedure. Rather, the record evidence cited by Plaintiffs establishes only that Plaintiffs did not recall the remarks and did not receive a written copy of the remarks. (Docs. # 183-8 at 101-02, 105, # 183-27 at 268-69).

[3] Form C-44B provides that "[e]xcept in minor misdemeanors (a misdemeanor offense or municipal ordinance violation for which the defendant will not be punished by sentence of imprisonment), the court will go over these rights … ." (Doc. # 183-26).

# 183-1 at 121-23). There were a few occasions where Judge Atchison instructed Seale to accept periodic payments. (*Id.*). Despite the fact that they explained their inability to pay, Woods and Douglas were not offered any options other than probation with JCS or jail. (Docs. # 193-4, # 193-5). Douglas was told that she either had to "go on JCS or go to jail." (Doc. # 193-4). At one point Woods asked Judge Atchison if community service was an option, but he responded that it was not offered. (Doc. # 193-5 at 2).

Judge Atchison expected JCS to follow his orders. (Doc. # 183-7 at 16, 19, 68). Judge Atchison signed pre-printed Probation Orders provided by JCS in blank before court, and JCS's probation officer, Lisha Kidd, completed the Orders afterward based on the Judge's notes on the ticket. (Doc. # 158 at 99-100). Judge Atchison wrote the fine amount on the back of a defendant's ticket, signed it, and the ticket was given to JCS. (Doc. # 183-47 at 535-36). The Probation Orders were three-part forms: one copy for the court, one for JCS, and one for the defendant. (Doc. # 158 at 99). Following the court session, Magistrate Seale reviewed the tickets and the Probation Orders to make sure the information matched. (Doc. # 183-1 at 100-01).

The Probation Orders specified the amount of the fine imposed and the required monthly payments. (Doc. # 183-11). A probationer also indicated on the pre-printed Orders if they waived the right to counsel. (*Id.*). The Orders instructed that the probationer was to "make a full and truthful report to your probation officer as instructed" and pay JCS "$35.00 for each month on probation" and "a one time $10.00" charge. (Doc. # 183-11). When a probationer paid off his or her fine and fees, probation ended. (Doc. # 183-8 at 125-26). Judge Atchison occasionally referred a defendant who submitted a substantial hardship affidavit to probation with JCS, but instructed JCS to waive their fees for that individual. (Doc. # 160 at 28-29). However, the Rule

56 evidence indicates that procedure was not followed with respect to Plaintiff Woods. (Docs. # 165 at 13-14, # 183-8 at 128-29).

In 2011, Judge Atchison ordered that all individuals on probation attend a compliance hearing ninety days after their initial appearance. (Docs. # 183-1 at 90-91, # 146-47, # 183-46 at 130). At the compliance hearing, Judge Atchison established a date certain for full payment. (Doc. # 183-46 at 134). A revocation hearing was then set for a future date. (Doc. # 183-46 at 134-35).

JCS kept the court informed regarding the status of probationers' payments and appointments with their probation officers. (Docs. # 66-7, # 66-1, # 66-12). When a probationer missed a payment or a meeting, JCS attempted to contact the probationer using the numbers provided. (Doc. # 183-46 at 233-34). If a probationer failed to appear for a meeting after a telephone call, JCS sent a letter. (*Id.* at 233-34). JCS informed probationers that if they continued to miss appointments or payments, they could be jailed. (Doc. # 183-27 at 17, 302-03).

Where offenders repeatedly failed to meet with JCS or make the required payments, JCS informed Magistrate Seale and/or prepared a petition to revoke the probation informing the court of the missed appointments and/or payments. (Docs. # 183-46 at 131-32, # 183-28 at 10, 15). After receiving non-compliance information from JCS, Judge Atchison decided whether to revoke probation. (Docs. # 183-7 at 19-20, # 183-46 at 131-32). For a period of time before mid-2012, when Shelby County Judge Harrington issued a scathing order regarding the Harpersville municipal court, JCS provided notice of court hearings to probationers. (Doc. # 183-1 at 83). At some point after June 2012, the court began to issue summonses for probationers to report for compliance hearings. (Doc. # 183-1 at 83-85). After that time, notices of court dates all came from the court. (Doc. # 183-27 at 283).

Occasionally, JCS requested that the court issue arrest warrants for non-compliance. (Docs. # 66-7, # 66-10, # 66-12). The warrants were issued by either Judge Atchison or Magistrate Seale. (Docs. # 183-1 at 21-22, 78, # 183-7 at 67-68). The bond amount was set at the time a warrant issued by a state-issued schedule. (Doc. # 183-1 at 21-22). JCS policy did not allow payments from probationers on warrant status. (Doc. # 183-50 at 512-13).

Magistrate Seale generally conducted bond hearings for arrestees within forty-eight to seventy-two hours of arrest. (Doc. # 183-1 at 24-25). At the bond hearing, she or another magistrate discussed the charges, the required bond, the defendant's rights, and the potential need for an attorney to be appointed for the defendant. (Doc. # 183-1 at 27-28). The factors Magistrate Seale covered during the bond hearings are listed on a standard form issued by the state. (Doc. # 183-1 at 27-28). At the bond hearing, the standard bond amount can be reduced. (Doc. # 183-1 at 24).[4] Judge Atchison determined whether to award credit against fines and fees for time served in jail. (Doc. # 183-1 at 272-73). As a general rule, Judge Atchison awarded a $20 credit per day spent in jail against the amount of a fine. (Doc. # 183-1 at 272-73).

### C.    Plaintiff Hali Woods

Plaintiff Hali Woods's employment history was sporadic because she was unable to make enough money to cover the cost of going to work. (Doc. # 183-8 at 43-56).

On June 27, 2013, Woods, a sixteen year old, was ticketed for failure to wear a seat belt while driving. (Docs. # 183-8 at 74, # 183-9, # 193-5). On August 13, 2013, Woods appeared in court. (Doc. # 183-8 at 81). Woods spoke with Magistrate Seale, who asked her how she wanted to plead. (*Id.*). Woods pleaded guilty. (Docs. # 183-8 at 78-79, # 165 at 3-4). She signed an

---

[4] Alabama Rule of Criminal Procedure 7.2(b) contains a "recommended" bail schedule. Ala. R. Civ. P. 7.2(b). That section specifically provides, however, that "courts should exercise discretion in setting bail *above or below* the scheduled amounts" taking into consideration such things as "prior releases on recognizance or on secured appearance bonds." Rule 7.2(a) and (b) (emphasis added).

Explanation of Rights Plea of Guilty form. (Doc. # 165 at 3-4). Her fine and court costs totaled $41. (Doc. # 183-9). Judge Atchison asked Woods if she had the money to pay the fine. (Doc. # 183-8 at 81). Woods explained that she did not have the money, that she lived with her mother whose only source of income was disability income, and that she did not have a job. (Docs. # 183-8 at 81, # 193-5). Atchison instructed her to sign up for a payment plan. (*Id.*). Atchison placed Woods on probation, and ordered her to pay $51 per month until her financial obligations were met. (Doc. # 165 at 5). The Order of Probation required Woods to pay JCS $35 for each month of probation and a $10 registration fee. (*Id.* at 5).[5] The August 13, 2013 Order required Woods to return to court on November 12, 2013 to show "completion of compliance." (*Id.*).

Consistent with the August 13, 2013 Order of Probation, on October 24, 2013, Magistrate Seale signed a Summons to Appear requiring Woods to appear in the municipal court on November 12, 2013. (*Id.* at 6). As of November 12, 2013, Woods had only paid $20. (*Id.* at 7). Half of this amount was credited against Woods's fine; the other half was credited towards Woods's JCS set-up fee. (Doc. # 193-17 at 4). Judge Atchison told Plaintiff to pay the balance of her fine and fees in full or he would see her back "in orange." (Doc. # 183-8 at 115). Atchison signed another Order of Probation which reinstated Woods to probation and required payment in full by January 22, 2014. (Doc. # 183-16 at 2). Judge Atchison's signature on the Probation Order is dated November 11, 2013, the day before Woods's November 12, 2013 court appearance. (Doc. # 193-20).

JCS prepared a violation report dated January 8, 2014, indicating that Woods had missed six of her twelve probation appointments and had paid only $10 on a balance of $181 in fines and fees. (Doc. # 183-18). Also on January 8, 2014, Magistrate Seale signed another Summons

---

[5] Alabama law provides that "[a]ny person [] who is granted probation [] and who is subject to supervision by the Board of Pardons and Paroles and who has an income shall be required to contribute forty dollars ($40) per month toward the cost of his or her supervision and rehabilitation … ." Ala. Code § 15-22-2(a)(1).

to Appear requiring Woods to appear in the municipal court on January 28, 2014. (Doc. # 183-17). The January 28, 2014 court date was rescheduled (Doc. # 183-19), and on February 10, 2014, Magistrate Seale signed another Summons to Appear requiring Woods to appear in the municipal court on February 25, 2014. (Doc. # 165 at 9). On February 25, 2014, Woods appeared and presented an Affidavit of Substantial Hardship on State of Alabama Unified Judicial System Form C-10. (*Id.* at 13-14). Woods told Judge Atchison that she had filled out the Affidavit and had $41 to pay off her fine. (Doc. # 183-8 at 128-29). Judge Atchison told her "it's not [his] problem and she could put that money toward what she owed." (*Id.*). The Affidavit was marked "not approved." (Doc. # 165 at 13-14). Judge Atchison signed another Probation Order which noted Woods's $41 payment and instructed her to return to court on May 27, 2014. (Doc. # 183-21).

On April 14, 2014, Woods paid JCS $130. (Doc. # 193-19). On April 22, 2014, less than one year after she was ticketed, Judge Atchison signed a Successful Termination of Probation form for Woods. (Doc. # 165 at 17).

Woods's fines and court costs did not exceed $500. (Doc. # 183-8 at 168). Woods never asked for an attorney to be appointed, she was never arrested in relation to her June 2013 offense, and a warrant for her arrest was never issued. (Docs. # 165, # 183-8 at 202-03).

### D.     Plaintiff Susan Douglas

Plaintiff Susan Douglas has never held a valid driver's license. (Doc. # 183-27 at 231). She has only held a learner's permit, which has been repeatedly suspended or revoked. (*Id.* at 9, 231). Douglas's permit was initially suspended because she received a ticket and she did not appear in court or pay the ticket. (*Id.* at 231-32). To have her permit reinstated, Douglas was obligated to go six months without receiving a ticket. (*Id.* at 232-33).

When Douglas originally moved to Alabama, she moved in with her grandmother, who resided on Highway 46 in Shelby, Alabama. (*Id.* at 32-39). In 2010, Douglas moved to a group home, where she remained until approximately 2011. (*Id.*). From the time Douglas moved out of the group home until the summer of 2014, Douglas lived with her grandmother on Highway 46. (*Id.*). Douglas moved to Austin, Texas for three or four months in or around the summer of 2014. (*Id.*). Douglas returned to live with her grandmother again from the fall of 2014 until August 2015. (*Id.*). Since 2015, Douglas has lived in Alabaster, Alabama. (Doc. # 183-27 at 24-25).

Douglas has a cell phone, but her service has been "cut off quite often" because she did not have the money to pay the bill. (*Id.* at 16-17). Therefore, she provided her grandmother's and sister's contact information to JCS so that she could be reached. (*Id.* at 17). On one occasion in 2013, when there was a warrant out for Douglas's arrest, her sister was pulled over by Columbiana Police to ask where they could find Douglas. (*Id.* at 18).

### 1.      Case Nos. TR12-18 and TR12-19

On January 14, 2012, Douglas was cited in Columbiana for driving while her license was suspended, a misdemeanor (Case No. TR 12-18), and for operating a vehicle without insurance, another misdemeanor (Case No.  TR 12-19). (Docs. # 165 at 19-40, # 165-1 at 2). Fine and court costs for these citations were $390 and $340, respectively. (*Id.*). In its Probation Tracker system, JCS erroneously listed the fine and court costs for these offenses as $390 and $540, respectively. (Doc. # 149-11 at 1).

At a February 14, 2012 hearing, Douglas pleaded guilty to both charges. (Doc. # 183-27 at 71-72). She signed an Explanation of Rights Plea of Guilty form for each charge. (Docs. # 183-28 at 2-3, # 183-29 at 2-3). Judge Atchison asked Douglas if she had the money to pay the fines in full. (Doc. # 183-27 at 71-76). Douglas responded that she did not have a job and did not

have the money. (*Id.*). Atchison told Douglas that she could either pay the tickets in full, sign up for JCS, or go to jail. (*Id.*). Douglas asked what JCS was, and Atchison told her it was a payment plan. (Doc. # 183-27 at 76). JCS prepared an Order of Probation that required Douglas, among other things, to pay her fine and costs in monthly installments, to pay a monthly probation fee of $35, to pay a one-time set-up charge of $10, and to meet with a JCS probation officer regularly. (Docs. # 183-28 at 5, # 183-29 at 5). The Order also required Douglas to return to court on May 8, 2012. (*Id.*). The original Order of Probation for these offenses was not signed by Judge Atchison. (Docs. # 183-28 at 5, # 183-29 at 5).

On March 29, 2012, JCS's Lisha Kidd prepared a Petition for Revocation of Probation listing the total due from Douglas as $1,080. (Doc. # 183-28 at 10).

On April 3, 2012, $270 was paid on Douglas's account. (Doc. # 149-11 at 5). From that payment, $10 was credited to Douglas's JCS set-up fee, $70 was credited to Douglas's monthly probation fees, and $190 was credited to her court fines. (*Id.*).

On May 8, 2012, Douglas appeared in court and was reinstated to probation. (Doc. # 182-28 at 9). Again, the Order of Probation was not signed by Judge Atchison. (*Id.*). On May 8, 2012, $280 was paid on Douglas's account. (Doc. # 149-11 at 5). From that payment, $35 was credited to Douglas's monthly probation fees, and $245 was credited to her court fines. (*Id.*).

Later in May 2012, in a matter unrelated to the Columbiana cases, Douglas was arrested for failing to pay a traffic ticket from Shelby County, and she was jailed for a month. (Doc. # 183-27 at 91-92). On May 21, 2012, someone called JCS to report that Douglas was in jail. (Doc. # 183-30 at 7).

On June 12, 2012, Judge Atchison signed an Order of Modification of Probation changing Douglas's status to "jail hold." (Doc. # 183-28 at 11).

On July 2 and 3, 2012, Kidd e-mailed Magistrate Seale informing her that Douglas had failed to make a payment. (Doc. # 183-29 at 12-13). Douglas had reported to JCS on June 29, 2012, but she had no money to make a payment. (Doc. # 183-30 at 6). Kidd requested that Seale issue a warrant for Douglas's arrest. (*Id.*). On July 5, 2012, Magistrate Seale signed a warrant for Douglas's arrest. (Doc. # 183-28 at 15). That warrant was executed and Douglas was committed to jail on November 27, 2012. (*Id.*). Douglas remained in jail until December 12, 2012, after a hearing on December 11, 2012, and after her sister made a payment on her behalf. (Docs. # 183-27 at 105-08, # 183-28 at 16-18).

On March 7, 2013, JCS notified Magistrate Seale that Douglas had paid in full on these cases and, in fact, had overpaid $15. (Doc. # 183-30 at 4). JCS terminated Douglas's probation on March 27, 2013. (*Id.*). Judge Atchison signed notices of Successful Termination of Probation in both cases on April 9, 2013. (Doc. # 165-1 at 23).

### 2. Case Nos. TR12-64, TR12-66, and TR12-67

On February 5, 2012, Columbiana police stopped and ticketed Douglas for having an expired tag (TR12-64), driving without insurance (TR-12-66), and driving with a suspended license (TR12-67). (Docs. # 183-27 at 123-24, # 183-31 at 2, # 183-32 at 2, # 183-33 at 2). Douglas did not appear for the March 13, 2012 hearing on those tickets because she did not have the money, and the court reset the hearing. (Doc. # 183-27 at 124-25). Before the next hearing, Douglas's sister paid off two of the three tickets, and the third ticket was dismissed. (Doc. # 183-27 at 125-26). Douglas was not placed on probation in relation to these three tickets.

### 3. Case Nos. TR13-95, TR13-260, TR13-262, and MC13-39

On February 28, 2013, Douglas was cited for driving while her license was revoked, a misdemeanor (Case No. TR 13-95). (Doc. # 183-34 at 2). Her fine and court costs totaled $416.

(*Id.* at 5). On April 9, 2013, Douglas pleaded guilty and signed an Explanation of Rights Plea of Guilty form. (*Id.* at 3-4). At the hearing, Douglas again told Judge Atchison she did not have the money to pay her fine, and he told her she could either sign up for JCS or go to jail. (Doc. # 183-27 at 133). Judge Atchison placed Douglas on probation and ordered her to pay $110 per month until her financial obligations were met. (Doc. # 183-34 at 5). Judge Atchison's Probation Order also ordered Douglas to pay JCS $35 for each month of probation and a $10 registration fee. (*Id.*). Douglas was also ordered to return to court on July 9, 2013 to show "completion of compliance." (*Id.* at 5).

On April 8, 2013, the day before her court appearance in Case No. TR 13-95, Columbiana police stopped and again ticketed Douglas for driving with a revoked license (Case No. TR13-262). (Doc. # 183-40 at 2). At the hearing on Case No. TR13-262, Douglas pleaded guilty, signed an Explanation of Rights Plea of Guilty form, but again could not pay her fine. (*Id.* at 3-4). Judge Atchison signed a Probation Order requiring Douglas to pay a fine and costs of $366. (*Id.* at 5).

On April 10, 2013, the day following her initial appearance in Case No. TR-13-95, and two days after receiving the ticket in Case No. TR 13-262, Douglas was arrested for attempting to elude a police officer, a misdemeanor (Case. No. WA 13-38). (Docs. # 183-27 at 180-82, # 183-42 at 3). Concurrently with this arrest, Douglas was ticketed yet again for driving with a revoked license (Case No. TR-13-260). (Docs. # 183-27 at 178, # 183-39 at 2). Douglas was bonded out on these charges within an hour. (Docs. # 183-27 at 181-83, # 183-42 at 8-9).

On May 28, 2013, Douglas pleaded guilty to attempting to elude and signed an Explanation of Rights Plea of Guilty form. (Doc. # 183-42 at 14-15). Judge Atchison signed a

Probation Order requiring Douglas to pay a fine and costs of $713. (*Id.* at 16). However, that Probation Order was placed on hold until she paid off her other fines. (Doc. # 183-27 at 211-12).

On July 9, 2013, the same day she was due to appear for a compliance hearing in Case No. TR-13-95, Douglas pleaded guilty to driving while her license was suspended (TR-13-260). (Doc. # 183-39 at 5-6). Judge Atchison's Probation Order assessed a fine and fees of $441 and ordered that Douglas pay her assessed fines and costs at a rate of $50 per week. (*Id.* at 7). The Probation Order set a compliance hearing for October 22, 2013. (*Id.*). After the October 22, 2013 hearing, Judge Atchison issued another Order of Probation requiring Douglas to pay in full by, and return to court on, January 28, 2014. (*Id.* at 16).

The January 28, 2014 hearing was rescheduled for February 25, 2014, and Magistrate Seale issued summonses to appear for that day. (Docs. # 183-35 at 6 (TR-13-95), # 183-45 at 9, # 183-39 at 18 (TR-13-260). Kidd prepared a Petition for Revocation of Douglas's probation dated February 24, 2014, listing sixteen missed appointments and showing an amount due of $1,621. (Doc. # 183-39 at 19). This petition related to Cases No. TR 13-260, TR 13-95, TR 13-262, and MC-13-39. (*Id.*). Douglas failed to appear at the February 25, 2014 hearing, and on March 10, 2014, Magistrate Seale issued an Alias Warrant for Douglas's arrest. (*Id.* at 20).[6] On April 22, 2014, Judge Atchison signed an Order of Modification of Probation changing the status from "Hold" to "Warrant." (Doc. # 168 at 18).

In 2011, prior to Douglas's Columbiana offenses, she was ticketed in Shelby County, Alabama, for driving with a suspended license (twice) and for operating a vehicle without a license, Shelby County Case Nos. TR 2011-11136, TR 2011-12929, TR-2011-12930. (Doc.

---

[6] The Ticket and Complaint for Case No. TR-13-260 is handwritten. The address written on the ticket looks like Hwy *96*, rather than Hwy 46. (Doc. # 183-39 at 2). The citation for Failure to Appear in Court on June 11, 2013 lists a Hwy *96* address. (*Id.* at 4). The Summons to Appear on October 22, 2013, signed by Magistrate Seal on October 15, 2013, lists the Hwy *96* address. (*Id.* at 14). The Summons to Appear on January 28 2014, signed by Magistrate Seal January 8, 2014, lists the correct Hwy 46 address. (*Id.* at 17).

# 175). In 2012, she was again ticketed in Shelby County, Alabama for driving with a suspended license, for driving with a revoked license, and for failing to display insurance, Shelby County Case Nos. TR 2012-512, TR 2012-1933, TR 2012-1934. (*Id.*). In 2013, Douglas had another Shelby County traffic citation for driving with a revoked license, Case No. TR -2013-3839. (*Id.*). On February 13, 2014, Shelby County issued an Alias Warrant for Douglas's arrest. (*Id.* at 31). Douglas was arrested on Shelby County's warrant on March 5, 2014. (*Id.* at 35). Douglas remained in the Shelby County Jail until her May 13, 2014 appearance in Columbiana municipal court, to which she was transported from the Shelby County Jail. (Doc. # 172 at 194-95).

On May 13, 2014, Magistrate Seale issued an Order of Release from Jail for Cases No. MC 13-39, TR 13-260, TR 13-262 and TR 13-95. (Doc. # 183-39 at 21). The day Douglas was released, Judge Atchison signed a Probation Order stating that if Douglas missed one appointment or payment, a warrant was to be issued for her arrest. (*Id.* at 22). Judge Atchison also told Douglas at the hearing that if she missed any payments he would issue a warrant for her arrest. (Doc. # 183-27 at 163-64).

On July 15, 2014, Magistrate Seale issued a summons for Douglas to appear in court on July 22, 2014. (Doc. # 183-39 at 27). Douglas appeared at the July 22 hearing. (*Id.* at 29). Judge Atchison signed another Probation Order reinstating Douglas to probation. (*Id.*).

In August and September 2014, the remaining balances on TR-13-95 and TR-13-260 were paid off. (Doc. # 183-27 at 98-99, 175-77). On September 12, 2014, Judge Atchison signed a Successful Termination of Probation for Douglas on Case Nos. TR 13-260 and TR-13-95. (Doc. # 183-35 at 18).

In December 2014, the remaining balance on TR-3-262 was paid off, and on January 13, 2015, the court entered an order of successful termination of probation. (Docs. # 183-40 at 16, 18, # 183-41).

On February 25, 2015, Magistrate Seale issued a Summons to Appear for Douglas to appear on March 10, 2015 on Case No. MC-13-39. (Doc. # 183-42 at 25). By March 9, 2015, Douglas had paid the remaining balance on the fines and court costs on Case No. MC-13-39. (*Id.* at 29). On March 10, 2015, Judge Atchison signed a Successful Termination of Probation for Douglas on Case No. MC-13-39. (Doc. # 168 at 31).

Douglas testified that JCS frequently called her grandmother and her sister trying to get in touch with Douglas. (Doc. # 183-27 at 16-18). Douglas had provided their telephone numbers to JCS because often times her own phone was cut off. (*Id.*).

Douglas testified that she never asked for a lawyer because did not believe she needed one for traffic tickets. (Doc. # 183-27 at 283-84).

## II.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories,

and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."

*Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Analysis

In their Third Amended Complaint, Plaintiffs have asserted the following claims against JCS under 42 U.S.C. § 1983:

> Count Two - Denial of Due Process and Conspiracy;
> Count Four - Violation of the Fourth Amendment and Conspiracy;
> Count Six - Violation of the Sixth Amendment and Conspiracy;
> Count Eight - Violation of the Eighth Amendment and Conspiracy;
> Count Ten - Denial of Equal Protection and Conspiracy; and
> Count Eleven – Declaratory and Injunctive Relief.

(Doc. # 143). Under each count, Plaintiffs assert both a direct claim that JCS violated their constitutional rights and a claim that JCS engaged in a conspiracy with the Columbiana municipal court to violate their constitutional rights. (Doc. # 143 at 31-75). The court first addresses two threshold issues—one concerning Plaintiffs' claims for declaratory and injunctive relief and one concerning JCS's claim to quasi-judicial immunity. It then separately analyzes Plaintiffs' direct and conspiracy-based § 1983 claims.

### A.    Plaintiffs' Claims for Declaratory and Injunctive Relief

In Count Eleven of the Third Amended Complaint, Plaintiffs assert a claim for declaratory and injunctive relief. This court has already addressed a similar claim in *Ray, et al. v. Judicial Corrections Services Inc. et al.*, Case No. 2:12-cv-02819-RDP, and determined that the separate claim is moot so long as JCS is no longer operating in Alabama. *Ray v. Judicial Correction Servs., Inc.*, 270 F. Supp. 3d 1262, 1287-88 (N.D. Ala. 2017). As the court explained in *Ray*:

> Mootness addresses justiciability concerns arising from factual changes that occur after a case's filing. "[M]ootness can be described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Strickland v. Alexander*, 772 F.3d 876, 887 (11th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). Defendants JCS and Correctional Healthcare appear to rely on JCS's voluntary cessation of operation in Alabama to justify mooting the claims for declaratory and injunctive relief.[] "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth*, 528 U.S. at 189, 120 S.Ct. 693 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)). Nevertheless, a case may be moot due to a private defendant's voluntary cessation of conduct "if subsequent events [make] it absolutely clear that the allegedly wrongful behavior [cannot] reasonably be expected to recur." *Id.* (*quoting United States v. Concentrated Phosphate Export Assn*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)).

*Id.* at 1288. The court concluded that the requests for declaratory and injunctive relief were due to be dismissed without prejudice as moot, subject to repleading if JCS reenters business in the state of Alabama. *Id.* "Injunctive relief," moreover, cannot stand as a separate claim because it is a form of relief, not a cause of action. *In re Managed Care Litig.*, 2009 WL 7848517, at *7 (S.D. Fla. Mar. 27, 2009) (citing *Hames v. City of Miami*, 479 F. Supp. 2d 1276, 1280 n. 3 (S.D. Fla. 2007)).

In their Prayer for Relief, Plaintiffs seek declaratory and injunctive relief in relation to substantive claims. (Doc. # 143 at 72-73). The court concludes that, although Plaintiffs' separate claim for declaratory relief is currently moot, they may pursue declaratory relief on claims which survive summary judgment.

### B.     JCS Is Not Immune

JCS maintains that it is entitled quasi-judicial immunity on Plaintiff's constitutional claims against it. JCS acknowledges that in *Ray*, this court held that JCS was not entitled to such immunity because it was sued in its official capacity, and the *Ray* plaintiffs did not assert individual capacity claims. (Doc. # 182 at 47-50 and n. 12). The cases cited by JCS in support of its argument are either distinguishable, non-binding, or both. (*Id.*). Like the claims in *Ray*, the claims Plaintiffs here assert against JCS in their Third Amended Complaint are official capacity claims based on alleged JCS policies and practices. (*See generally* Doc. # 143). Just as in *Ray*, JCS relies on *Buckner* and *Monell* to argue that Plaintiffs must prove that a JCS custom or policy caused the constitutional violations to hold it liable on those claim. (Doc. # 182 at 26-28).

As several courts have explained, quasi-judicial immunity is a defense to individual capacity § 1983 suits, but not official capacity suits. *VanHorn v. Oelschlager*, 502 F.3d 775, 779 (8th Cir. 2007) (holding that commissioners for the Nebraska State Racing Commission could not receive quasi-judicial immunity in their official capacities); *Alkire v. Irving*, 330 F.3d 802, 810-11 (6th Cir. 2003) (explaining that a sheriff and county judge could not claim quasi-judicial or qualified immunity for official-capacity § 1983 claims). When a private corporate entity contracts with a public entity to offer functions "traditionally within the exclusive prerogative of the state[,]...it becomes the functional equivalent of [a] municipality." *Buckner*, 116 F.3d at 452. In other words, a suit against such a corporate entity is an official capacity suit. *See Kentucky v.*

*Graham*, 473 U.S. 159, 165–67 (1985) (explaining that an official capacity § 1983 suit is one "against an entity of which an officer is an agent" and that personal immunity defenses are unavailable in such suits). Because Plaintiffs are not suing JCS in an individual capacity, it cannot claim quasi-judicial immunity. *Cf. Swann v. S. Health Partners, Inc.*, 388 F.3d 834, 837 (11th Cir. 2004) (explaining that the rationale against immunity for municipalities "is applicable in § 1983 suits against non-governmental entities not entitled to qualified immunity"), *overruled on other grounds* as explained in *Randall v. Scott*, 610 F.3d 701, 709–10 (11th Cir. 2010).

Nor is JCS entitled to a qualified immunity defense. As the Eleventh Circuit has held, private corporations that enter contracts to provide traditionally public services are functionally equivalent to municipalities for purposes of § 1983 suits, *Buckner*, 116 F.3d at 452, and, like municipalities, they are not entitled to claim qualified immunity. *See Swann*, 388 F.3d at 837. Therefore, JCS's argument that it is entitled to qualified immunity is without merit.[7]

### C.      Plaintiffs' Direct § 1983 Claims

Each of Plaintiffs' claims against JCS has two aspects—a direct claim under § 1983 and a related conspiracy claim. (Doc. # 143). In *Ray*, the court set forth the legal standards under which Plaintiffs' direct § 1983 claims against JCS are to be analyzed:

> [W]hen a private entity contracts to perform a traditional function exclusively within the state's prerogative, "it becomes the functional equivalent of the municipality." [*Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997)]. A

---

[7] For the same reasons discussed by the court in *Ray*, neither the R*ooker-Feldman* doctrine, nor *Heck v. Humphrey*, bars Plaintiffs' claims in this case. The *Rooker-Feldman* doctrine bars "federal court jurisdiction where the issue before the federal court [is] 'inextricably intertwined' with the state court judgment so that (1) the success of the federal claim would 'effectively nullify' the state court judgment, or that (2) the federal claim would succeed 'only to the extent that the state court wrongly decided the issues.'" *Alvarez v. Att'y Gen. of Fla.*, 679 F.3d 1257, 1262–63 (11th Cir. 2012). Here, Plaintiffs' § 1983 claims do not challenge the probation orders or sentences imposed by the municipal court, but instead challenge JCS's policies and practices and request that JCS be required to pay damages. *See Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 606 (6th Cir. 2007) (explaining that "[a]ssertions of injury that do not implicate state-court judgments are beyond the purview of the *Rooker-Feldman* doctrine"). As to *Heck v. Humphrey*, 512 U.S. 477 (1994), the Eleventh Circuit has explained that "*Heck's* rule [does not] extend to a case like this one: where Plaintiff is not in custody and where Plaintiff's action—even if decided in his favor—in no way implies the invalidity of his conviction or of the sentence imposed by his conviction." *Morrow v. Federal Bureau of Prisons*, 610 F.3d 1271, 1272 (11th Cir. 2010).

municipality is liable under § 1983 when a municipal employee or agent undertakes an action in "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." [*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978)]. "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id*. at 691[]. A plaintiff may establish the existence of a municipal "policy" by identifying "(1) an officially promulgated [municipal] policy or (2) an unofficial custom or practice of the [municipality] shown through the repeated acts of a final policymaker." *Grech v. Clayton Cty., Ga*., 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*).

To present a viable § 1983 claim against a municipality (or private entity), a plaintiff must show that a municipal policy or custom was the "moving force" behind an injury. *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404[] (1997). This causation element of a Section 1983 claim is easier to prove when the entity's action itself violates the Constitution. *Id*. at 404 []. But, when a plaintiff's claim relies on a facially lawful policy or custom causing a constitutional violation, a court must apply a rigorous standard of causation to avoid imposing respondeat superior liability on a municipality. *Id*. at 405 [].

For these and other reasons, the court cannot apply a strict "but for" causation standard when reviewing whether a facially valid municipal policy or custom caused a constitutional violation by others. *McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004). A plaintiff cannot hold a municipality liable for a constitutional violation merely because its custom or policy made it more likely that a constitutional violation would occur. *Id*. (citing *Brown*, 520 U.S. at 411 []). Indeed, as the Sixth Circuit has explained, a court must determine that a defendant's act was a proximate cause of the ultimate constitutional violation in order for it to be considered a moving force. [*Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007)]. Applying this framework in *Powers*, the Sixth Circuit discussed situations where a judicial act constitutes a superseding cause that severs the chain of liability begun by another state actor's conduct. *Id*. at 610. A judicial act generally severs the chain of liability where a judge misapplies the law after another state actor has informed the judge of all the material facts. *Id*. A judicial act generally does not sever the chain of liability, though, if the other state actor misrepresents or omits material facts. *Id*.

270 F. Supp. 3d at 1288. With the exception of Plaintiffs' Fourth Amendment claims (which they have abandoned[8]), the court must apply this framework to each of the alleged constitutional violations on which Plaintiffs' direct § 1983 claims are premised.

---

[8] Though Plaintiffs asserted both direct and conspiracy-based Fourth Amendment claims in their Third Amended Complaint (Doc. # 143 at 49-51), they failed to address those claims in their response in opposition to JCS's motion for summary judgment (Doc. # 192). Plaintiffs have therefore abandoned their Fourth Amendment claims. *See Chambers v. Cherokee Cty.*, 743 F. App'x 960, 962 (11th Cir. 2018).

### 1.  Plaintiffs' Due Process Claims

Plaintiffs assert that JCS directly violated their right to due process in three ways. First, Plaintiffs argue that JCS failed to give them notice of hearings. (Doc. # 192 at 51). Second, Plaintiff Douglas argues that JCS was responsible for arresting and jailing her for failing to pay her fines without conducting a meaningful indigency investigation. (Docs. # 143 at 41-42, # 192 at 56). Third, Plaintiffs argue they were denied due process when JCS threatened them with probation revocation, increased fines and costs, and jail time if they did not pay their fines and fees. (Docs. # 143 at ¶ 211, # 192 at 57).

### a.  Any Claim Based on a Failure to Give Notice of Hearings Is Time-Barred

Plaintiffs assert that "due process requires that a person receive notice of charges against him or her and to have an opportunity to meaningfully respond to the charges prior to a conviction of punishment." (Doc. # 192 at 51). Plaintiffs argue that they were not provided notice of hearings pursuant to JCS's scheme in Columbiana. (*Id.*). The undisputed evidence shows, however, that Plaintiffs received notice of the charges against them, appeared in the municipal court, and pleaded guilty to those charges (as evidenced by the Explanation of Rights Plea of Guilty form executed by Plaintiffs on each charge against them).

Plaintiffs further argue that, after their initial appearances, they did not receive notice of all scheduled hearings. They contend JCS is responsible for this asserted failure to provide notice of hearings. The Orders of Probation prepared by JCS and generally signed by Judge Atchison listed a date on which the probationer was required to return to court to show compliance. (*See, e.g.*, Doc. # 183-34 at 5). The Probation Orders were three-part forms; one copy was for the court, one for JCS, and one was given to the defendant the day she was placed on probation. (Doc. # 158 at 99).

The evidence shows that there was a period of time, prior to mid-2012, when JCS was responsible for providing notice of hearings. (Doc. # 183-1 at 82-83). The only form in evidence that both required a plaintiff's appearance in court and was issued by JCS was signed by Lisha Kidd on June 27, 2012. (Doc. # 165 at 31). Although the document is ostensibly dated June 27, 2012, it instructs Douglas to appear in court on June 26, 2012. (*Id.*). Douglas failed to appear on June 26, 2012, and an alias warrant was issued for her arrest by Magistrate Seale on July 5, 2012. (*Id.* at 32). Douglas was arrested on the July 5, 2012 warrant about four and a half months after its issuance—on November 27, 2012. (*Id.*). Douglas was released from jail on December 12, 2012.

Magistrate Seale testified that at some point after Judge Harrington's July 11, 2012 Order regarding the Harpersville municipal court was issued, the Columbiana court began issuing its own summonses. (Docs. # 183-1 at 82-85, # 193-13). At that point in time, the Columbiana municipal court took over the function of giving notice of hearings to probationers. (*Id.*). All other summonses that appear in the Rule 56 record were signed by Magistrate Seale, not JCS. Thus, any failure to give notice after that point in time necessarily cannot be the result of a JCS custom or policy, as the responsibility to give notice of the hearings rested solely with the Columbiana municipal court.

In Alabama, the statute of limitations for filing a § 1983 action is two years. *Lufkin v. McCallum*, 956 F.2d 1104, 1105-08 & n.2 (11th Cir. 1992); Ala. Code § 6-2-38(l). As noted above, the only Rule 56 evidence in this case regarding a failure to give notice of hearings by JCS relates to a notice issued by JCS, rather than by the municipal court, on June 27, 2012. (Doc. # 165 at 31). Douglas was arrested on November 27, 2012 in relation to her failure to appear for the hearing referenced in that notice. She was released from jail on December 12, 2012—more

than two years before the initial complaint in this action was filed on March 25, 2015, and more than three years before JCS was first named as a party-defendant in this case on March 9, 2016. (Docs. # 1, # 35). Plaintiffs have failed to present evidence of a policy or custom attributable *to JCS* which caused a due process violation of failing to give notice of a hearing during the applicable limitations period.

**b.      Plaintiff Douglas's *Bearden v. Georgia* Claim**

Douglas argues that JCS violated her due process rights by having her arrested and jailed for failing to pay her fines without conducting a meaningful indigency investigation. In response, JCS contends the evidence shows that neither Plaintiff was ever arrested at the request of JCS. This contention is correct with respect to Woods—she was never arrested or jailed, and no warrant was ever issued for her arrest. However, there is evidence in the record that Magistrate Seale issued an arrest warrant for Douglas shortly after JCS employee Lisha Kidd sent e-mails to Seale requesting issuance of a warrant for Douglas's arrest. (Docs. # 66-10, # 66-7, # 183-28 at 15, # 183-29 at 18).

In *Bearden v. Georgia*, 461 U.S. 660 (1983), the Supreme Court established a substantive limit on when courts may automatically revoke probation for a probationer's failure to pay fines or restitution. *Black v. Romano*, 471 U.S. 606, 611 (1985). *Bearden* requires a court conducting a revocation hearing to ask a probationer why he or she failed to pay a fine or restitution ordered as a condition of probation. *Bearden*, 461 U.S. at 672. On the one hand, "[i]f the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority." *Id.* On the other hand, "[i]f the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so,

the court must consider alternate measures of punishment other than imprisonment." *Id*. And "[o]nly if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay." *Id.*

Plaintiffs have not presented evidence of a JCS custom or policy that was a moving force behind the municipal court's failure to meaningfully examine Plaintiffs' claimed indigency. Alabama law directs a *court* to consider a defendant's financial resources and ability to pay a fine when determining whether to impose a fine. Ala. R. Crim. P. 26.11(b). And, if a probationer breaches the terms of probation by not paying fines, costs, restitution, or other assessments, a *court*, not a probation officer, "must inquire into the probationer's financial status and determine whether the probationer is indigent." Ala. R. Crim. P. 27.5(a). And most significantly, *Bearden* places the constitutional responsibility to conduct an indigency investigation squarely on the "sentencing court"—not any other entity. 461 U.S. at 672. Here, Plaintiffs have presented no evidence of a JCS custom or policy that was a moving force behind the municipal court's failure to assess Douglas's indigency prior to subjecting her to incarceration for failing to pay fines. Nor have Plaintiffs shown that JCS had a policy or custom prohibiting the municipal court from complying with these obligations. Accordingly, JCS cannot have directly violated Douglas's due process rights under *Bearden*.

### c. Plaintiffs' Claims Based on JCS's Alleged Threats

Plaintiffs argue that JCS's threats of probation revocation and jail time, along with increased fines and costs constitute a denial of due process. (Docs. # 143 at ¶ 211, # 192 at 57). However, Plaintiffs "fail to present, and the court has not been able to find, any binding precedent—or broad principle—establishing that the mere threat of a constitutional violation is

in itself a constitutional violation." *Armstrong v. Scott*, 2019 WL 952330, at *5 (N.D. Ala. Feb. 27, 2019); *Dick v. Gainer*, 1998 WL 214703, at *5 (N.D. Ill. Apr. 23, 1998), *aff'd*, 172 F.3d 52 (7th Cir. 1998) ("There is no constitutional right to be free from threats of arrest; an actual civil rights violation must occur before a cause of action arises under § 1983."). For this reason, this argument cannot stand.

### 2. Plaintiffs' Sixth Amendment Right to Counsel Claims

Plaintiffs next argue that JCS violated their Sixth Amendment rights by having them arrested and jailed without the appointment of counsel. The Sixth Amendment guarantees certain rights to criminal defendants, including the right to counsel. "'The Sixth Amendment right to counsel at all critical stages applies in all cases where an indigent defendant faces incarceration, regardless whether the offense was a misdemeanor or felony.'" *Pittman v. United States*, 2011 WL 1085107, at *2 (S.D. Ga. Mar. 2, 2011), *report and recommendation adopted*, 2011 WL 997018 (S.D. Ga. Mar. 21, 2011) (quoting *United States v. Rubio*, 629 F.3d 490, 493 (5th Cir.2010)). "Incarceration is key." *Pittman*, 2011 WL 1085107, at *2.

The Supreme Court has held that a defendant's Sixth Amendment right to appointed counsel is applicable when she receives a suspended term of imprisonment and a probationary sentence. *Alabama v. Shelton*, 535 U.S. 654, 662 (2002). And, Alabama law provides that probation suspends execution of a sentence. *See* Ala. Code § 12–14–13(a). It defies logic, fact, and law to say that a probation sentence may be "revoked" unless an underlying imprisonment sentence was implied in the initial probation sentence. *Id.*; *see also Ray*, 270 F. Supp. 3d at 1316. Therefore, without question, Plaintiffs' Sixth Amendment rights were implicated by the proceedings in the Columbiana municipal court.

A defendant may waive the Sixth Amendment right to counsel if the waiver is voluntary, knowing, and intelligent. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). "[T]he 'ideal method' of assuring that a defendant understands the consequences of a waiver is for the *trial court* to conduct a pretrial hearing" commonly referred to as a "*Faretta* inquiry." *United States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002) (citing *United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir.1995)) (emphasis added).

Here, the record evidence shows that Plaintiffs executed statements indicating they waived their right to counsel in the Probation Orders issued by the municipal court. The municipal *court* had an obligation to ensure any waiver of counsel was knowing and voluntary. But the municipal court conducted no inquiry, *Faretta* or otherwise, into whether that waiver was knowing and voluntary. In this respect, the municipal court fell far short of its judicial duty. Nevertheless, the Rule 56 record is devoid of any evidence that *JCS* had any custom or practice that was a moving force behind the municipal court's failure to conduct the relevant inquiry. Nor have Plaintiffs shown that JCS had a policy or custom prohibiting the municipal court from conducting the inquiry. Because Plaintiffs have not shown that a JCS policy or custom was the "moving force" behind their injury, Plaintiffs have not presented evidence sufficient to establish a viable direct § 1983 claim against JCS. *Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. at 404.

### 3. Plaintiffs' Eighth Amendment Excessive Fines Claims

The Excessive Fines Clause of the Eighth Amendment protects Americans not just from the federal government but also from the states. *Timbs v. Indiana*, 139 S. Ct. 682, 698 (2019) ("[T]he Eighth Amendment's prohibition on excessive fines applies in full to the States."). Plaintiffs claim that JCS violated their Eight Amendment rights by charging excessive fines in

the form of probation fees. In their Response to JCS's Motion for Summary Judgment on this claim, Plaintiffs adopt and incorporate their brief in opposition to the City of Columbiana's Motion for Summary Judgment on the same claim. (Doc. # 192 at 57). There, Plaintiffs argued that JCS's probation fees are not authorized by statute. (Doc. # 192 at 51). The court disposed of this argument in *Ray*:

> Plaintiffs have not identified—and the court's independent research has not found—a statutory limit on probation supervision fees to private corporations under Alabama law. Indeed, Alabama law allows a court wide discretion to determine the conditions of probation, and those conditions may include costs imposed on the probationer. Ala. Code § 12–14–13(d)(7); Ala. R. Crim. P. 27.1, Editors' Notes, Committee Comments. Indeed, if supervised by the Board of Pardons and Paroles, a probationer must pay $40 a month, which is in effect similar to the supervision fee that was charged by JCS. Ala. Code § 15–22–2(a)(1). Although the court has not found an Alabama statute expressly permitting state courts to order probation fees paid to private corporations, it also has not found a statute expressly limiting a municipal court's wide discretion to determine probation conditions.

270 F. Supp. 3d at 1301.

Plaintiffs' argument contains absolutely no analysis of how or even whether a JCS custom or policy was a moving force behind any alleged excessive fines. All fines and probation fees were imposed by the municipal court. JCS "charged" what the municipal court ordered to be "charged." For this reason alone, JCS cannot be directly liable under § 1983 for any violation of the Excessive Fines Clause.

Moreover, as noted in *Carden v. Town of Harpersville*,

> The Eighth Amendment prohibits courts from imposing "excessive fines." U.S. Const. amend. VIII. Its Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *Austin v. United States*, 509 U.S. 602, 609-10 (1993) (emphasis omitted) (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc*., 492 U.S. 257, 265 (1989)). In an opinion addressing whether civil punitive damages awards are subject to the Excessive Fines Clause, the Supreme Court explained that "the Excessive Fines Clause was intended to limit only those fines directly imposed by, and payable to, the government." *Browning-Ferris*, 492 U.S. at 268 (emphasis added). *See also Coleman v. Watt*, 40 F.3d 255, 263 (8th Cir. 1994) (defining a

"fine" as "a payment extracted by the government and payable to the government").

2017 WL 4180858, at *20 (N.D. Ala. Sept. 21, 2017); *see also Ray v. Judicial Correction Servs., Inc.*, 2018 WL 3012276, at *5 (N.D. Ala. June 15, 2018) ("[A]lthough Plaintiffs have proffered [other, non-binding] decisions as persuasive authority, the court is not persuaded, particularly in light of [] *Browning-Ferris*[.]"). Here, as in *Carden*, Plaintiff's Eighth Amendment claim for excessive fines, fees, and costs rests on the allegedly unlawful imposition of probation supervision fees. (*See* Doc. # 143 at 59-62). However, the Rule 56 evidence makes clear that the monthly fees were demanded by JCS (pursuant to court order) and payable to JCS. (*See* Doc. # 183-1 at 121-22, 196-98, 203-04). But, because the monthly probation supervision fees in question were payable to JCS, rather than a governmental entity, there is a question as to whether the fees can be considered fines subject to the Excessive Fines Clause. *Browning-Ferris*, 492 U.S. at 268.

The monthly probation supervision fees also cannot be subject to Excessive Fines Clause scrutiny because they are not imposed as *punishment* for a crime. *Austin v. United States*, 509 U.S. 602, 606-11 (1993). In *Austin*, the Supreme Court held that civil asset forfeitures by the federal government are subject to the Excessive Fines Clause because forfeiture is at least in part punishment for a crime and does not serve merely remedial purposes. *Id.* at 610-22. In so holding, the Court explained that the Excessive Fines Clause applies only to sanctions that (1) were understood at the time the Eighth Amendment was ratified at least in part as punishment and (2) are properly understood as punishment today. *Id.* at 610-11.

Whatever might be said of probation supervision fees at the time of the founding (if they even existed), it is clear that the fees paid to JCS in this case do not constitute a form of "punishment" as that term is properly understood today under Supreme Court precedent. The $10

one-time set-up fee and $35 monthly fee plainly served the purpose of compensating JCS for its probation supervision services, not punishing offenders. The fees did not vary based on the severity of the probationer's offense or on the probationer's post-plea conduct; they were instead uniform for each probationer. Unlike the civil asset forfeiture statutes at issue in *Austin*, nothing about the probation supervision fees focuses "on the culpability of the [probationer] in a way that makes them look . . . like punishment." *Id.* at 619. Thus, the fees paid to JCS in this case are simply not subject to Excessive Fines Clause scrutiny.

Finally, even if JCS did have a custom or policy that was a moving force behind the court-ordered probation supervision fees it collected, and even if those fees counted as "fines" subject to the Excessive Fines Clause, the court concludes the fees JCS collected were not excessive. Under Alabama law, non-indigent probationers who are supervised by the Board of Pardons and Paroles must pay the Board $40 per month toward the cost of their supervision. Ala. Code § 15-22-2(a)(1). The monthly supervision fee probationers paid to JCS was even less—just $35 per month. Plaintiffs have offered no authority supporting the contention that a monthly probation supervision fee of this amount is excessive within the meaning of the Eighth Amendment. The court concludes that such a fee is not excessive.

For all these reasons, JCS is entitled to summary judgment on Plaintiff's Eighth Amendment claim relating to the probation supervision fees.

### 4.    Plaintiffs' Equal Protection Claims

The Eleventh Circuit has made clear: a court violates a defendant's equal protection rights if it incarcerates that defendant solely because he or she lacks the resources to pay a fine or restitution. *United States v. Plate*, 839 F.3d 950, 955–56 (11th Cir. 2016). Plaintiffs allege that JCS imposes additional probation fees only on probationers who are unable to immediately pay

their original fines in full, and then incarcerates these individuals for failing to pay probation fees. (Doc. # 143 at 66-67).

Plaintiffs adopt their briefing in *Ray* in support of their argument that JCS violated the Equal Protection Clause. There, Plaintiffs argued that JCS's probation practices violated their equal protection rights because poor defendants in the City's municipal court were forced to pay more in fines and fees simply because they were poor. They further argue that the municipal court's probation procedure, as implemented by JCS, determined the punishment a defendant received by his or her wealth status. (*See* Doc. # 192 at 57; *Ray*, 270 F. Supp. 3d at 1310-11). JCS responds that it made no decisions regarding the payment of fines, costs, and fees; it made no decisions regarding who was placed on probation; and it only became involved after Judge Atchison entered a Probation Order. (Doc. # 182 at 46).

Here, the Rule 56 evidence shows that Plaintiffs were not sentenced to imprisonment solely because they could not pay their fines. Rather, they were sentenced to *probation* and required to pay their fines in installments because they could not initially pay them in full. In *Tate v. Short*, the Supreme Court indicated in a footnote that a state could, consistent with the Equal Protection Clause, direct a defendant to pay a fine in installments. 401 U.S. 395, 400 n.5 (1971). In *Ray,* the court held that "the Equal Protection Clause, as interpreted by the Supreme Court in *Williams* [*v. Illinois*, 399 U.S. 235, 243 (1970)] and *Tate*, did not prohibit the Municipal Court from sentencing the named Plaintiffs to *probation* because they were unable to pay fines." *Ray*, 270 F. Supp. 3d at 1311-12 (emphasis added).

Additionally, the Rule 56 record shows that Woods was never imprisoned, so she clearly cannot establish an equal protection claim under *Williams* and *Tate*. And, Douglas was not imprisoned by the municipal court *solely* due to her inability to pay her fines. She was

imprisoned because, in addition to failing to pay her fines, she failed to attend numerous probation appointments. Therefore, Plaintiffs have not offered evidence from which a reasonable jury could find an equal protection violation.

Finally, even if they had made such a showing, the Rule 56 record is clear: it was the municipal court (not JCS) which adjudicated Plaintiffs' criminal cases. To establish an equal protection claim against JCS, Plaintiffs must show a *JCS* policy or custom caused the municipal court to violate their equal protection rights. Because Plaintiffs have not shown that a JCS policy or custom was the "moving force" behind their injury, Plaintiffs have not presented evidence sufficient to establish a viable direct § 1983 claim against JCS. *Bd. of Cty. Comm'rs of Bryan Cty., Okla*., 520 U.S. at 404.

### C.    Plaintiffs' § 1983 Conspiracy Claims

In addition to their direct § 1983 claims, Plaintiffs also allege that JCS *conspired* to violate their constitutional rights. (Doc. # 143). "Conspiracy is not itself a constitutional tort under § 1983." *Lacey v. Maricopa Cty*., 693 F.3d 896, 935 (9th Cir. 2012) (*en banc*). "[T]here must always be an underlying constitutional violation. Conspiracy may, however, enlarge the pool of responsible defendants by demonstrating their causal connections to the violation; the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired." *Id*.

"A plaintiff may [establish] a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right." *Grider v. City of Auburn, Ala*., 618 F.3d 1240, 1260 (11th Cir. 2010) (citing *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998)). "To establish a conspiracy claim under § 1983, a plaintiff must allege three elements: '(1) a violation of [her]

federal rights; (2) an agreement among the Defendants to violate such a right; and (3) an [underlying] actionable wrong.'" *Williams v. Fulton Cty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1148 (N.D. Ga. 2016) (quoting *Gibbons v. McBride*, 124 F. Supp. 3d 1342, 1379 (S.D. Ga. 2015)); *see also Grider*, 618 F.3d at 1260.

A conspiracy exists if conspirators "reached an understanding to deny the plaintiff's rights." *Myers v. Bowman*, 713 F.3d 1319, 1332 (11th Cir. 2013) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008)). That is, a "[c]onspiracy requires an agreement—and in particular an agreement to do an unlawful act—between or among two or more separate persons." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1867 (2017); *see also Grider*, 618 F.3d at 1260 ("A plaintiff claiming a § 1983 conspiracy must prove the defendants 'reached an understanding' to violate the plaintiff's constitutional rights.").

Plaintiffs may prove a conspiracy through circumstantial evidence. *Am. Fed'n of Labor and Congress of Indus. Orgs. v. City of Miami, Fla*., 637 F.3d 1178, 1191 (11th Cir. 2011). Such an agreement may be inferred from the parties' relationship, their overt acts, their concert of action, and the totality of their conduct. *Id.* at 1192. Indeed, a jury may infer the existence of an agreement from evidence that the conspirators committed acts that "are unlikely to have been undertaken without an agreement." *Ray*, 270 F. Supp. 3d at 1313 (quoting *Mendocino Environmental Ctr. v. Mendocino Cty*., 192 F.3d 1283, 1301 (9th Cir. 1999) (in turn quoting *Kunik v. Racine County*, 946 F.2d 1574, 1580 (7th Cir.1991))).

### 1.     Evidence of an Agreement to Infringe Constitutional Rights

Plaintiffs argue that there is sufficient evidence of a conspiracy to violate (1) Plaintiffs' due process right not to be jailed for non-payment of a fine without first inquiring into whether

they had the ability to pay, and (2) Plaintiffs' Sixth Amendment right to counsel. (*See* Doc. # 192 at 58-62; *see also* Case No. 2:12-cv-2819-RDP, Doc. # 709 at 23-29).

The Rule 56 record contains evidence from which a jury could find a variety of agreements involving JCS and the Columbiana municipal court regarding municipal court operations. There is the JCS Contract signed by the Mayor of the City, but listing the City, the municipal court, and JCS as parties to the agreement. (Doc. # 183-2). There is evidence that the Columbiana municipal court explored the private probation option in an effort to save the court from having to hire another full time employee. (Doc. # 158 at 37). There is evidence showing that Judge Atchison consistently placed defendants on probation supervised by JCS -- which required the individuals to pay additional fees -- when those defendants could not pay the fines and costs owed to the municipal court and without undertaking an indigency inquiry.

The Rule 56 record also shows that Judge Atchison signed form Probation Orders containing waivers of counsel which were provided by JCS in blank form before court started, and that JCS's probation officer, Kidd, completed those forms after the defendant pleaded guilty based on the Judge's notes on the ticket. (Doc. # 158 at 99-100). The standard conditions of probation pre-printed by JCS on the form included JCS's initial $10 set-up fee and its monthly $35 fee. (Doc. # 193-20). There is also record evidence that Douglas was placed on probation based on a Probation Order that was not signed by Judge Atchison. (Docs. # 183-28 at 5, # 183-29 at 5).

Further, a jury could conclude that JCS's financial interests would be harmed by the municipal court declaring a probationer indigent, because JCS would be obligated to supervise that defendant's probation for free. (*See* Doc. # 183-2 at 3) ("JCS will also supervise indigent cases … These cases will not be charged the standard probation fee …"). In light of JCS's

financial incentive to not have defendants declared indigent, a reasonable jury could find that the pre-printed and signed Probation Orders, along with Judge Atchison's consistent failure to conduct indigency determinations, constitute circumstantial evidence of an agreement between the court and JCS to impose fines and obtain waivers of counsel without addressing probationers' indigency, in violation of the constitutional right announced in *Bearden v. Georgia*, 461 U.S. 660 (1983).

There is also Rule 56 evidence that JCS played a role in the municipal court's issuance of arrest warrants for probationers under JCS supervision. JCS kept the court informed regarding the status of probationers' payments and appointments with their probation officers. (Docs. # 66-7, # 66-1, # 66-12). Although Magistrate Seale ultimately signed the warrant for Douglas's arrest, JCS prepared a Petition for Revocation of Douglas's probation on February 24, 2014, listing sixteen missed appointments and showing an amount due of $1,621. (Doc. # 183-39 at 19). Douglas failed to appear at a February 25, 2014 hearing, and on March 10, 2014, Magistrate Seale issued an Alias Warrant for Douglas's arrest. (Doc. # 183-39 at 20).

Woods and Douglas have both presented evidence that they pleaded guilty without the assistance of counsel and informed Judge Atchison of their indigency, but were placed on probation without any meaningful inquiry into the reason for their ability to pay. (*See, e.g.*, Docs. # 193-4, 193-4). Douglas told Judge Atchison that she did not have a job and did not have the money to pay her fine, but the only options he gave her were to pay the tickets in full, sign up for JCS, or go to jail. (Doc. # 183-27 at 71-76). Woods, who was sixteen years old, explained that she did not have the money to pay her fine, that she lived with her mother whose only source of income was disability income, and that she did not have a job. (Docs. # 183-8 at 81, 193-5). Judge Atchison told her to sign up for a payment plan with JCS. (*Id.*). At one point Woods asked

Judge Atchison if community service was an option, but he said it was not offered. (Doc. # 193-5 at 2). Later, Judge Atchison told Woods to pay the balance of her fine and fees in full or he would see her back "in orange." (Doc. # 183-8 at 115).

From this evidence a reasonable jury could infer an agreement between the municipal court and JCS to (1) impose probation and related fines and (2) obtain waivers of the right to counsel, all without conducting the hearings required by *Bearden*, Alabama law, or *Faretta*.

### 2. Constitutional Violations Caused by the Agreement

There is also record evidence of two constitutional violations that a jury could reasonably find were caused by an unlawful conspiracy between JCS and the municipal court. First, when the municipal court effectively revoked her probation without conducting a proper indigency determination, Douglas suffered a due process violation based upon a purported agreement between JCS and the municipal court. Second, a jury could find Plaintiffs' Sixth Amendment rights were violated when they were denied and/or coerced to waive the assistance of counsel in matters before the municipal court despite the fact that they potentially faced incarceration.

### a. Plaintiff Douglas's Due Process Claim Under *Bearden*

Under *Bearden*, a court conducting a revocation hearing is required to determine why a probationer failed to pay a fine or restitution ordered as a condition of probation. *Bearden*, 461 U.S. at 672. "If the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment … ." *Id.* "If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment." *Id.*

A fair reading of the Rule 56 record reveals that there is substantial evidence showing Plaintiffs were denied any meaningful opportunity to explain their indigency or their inability to pay the fines and fees imposed by the municipal court. The record also indicates that both JCS and the municipal court had a financial incentive for JCS to collect fines and probation fees. Douglas's probation was revoked, and she was jailed, at least in part because of her inability to pay the fines and probation fees, despite having informed Judge Atchison of her indigency. On the present record, a jury could reasonably find that Douglas had her probation revoked and was incarcerated based on an agreement between JCS and the municipal court not to examine probationers' ability to pay fines and fees imposed by the municipal court.

### b.      Plaintiffs' Sixth Amendment Right to Counsel Claims

As discussed above, a defendant has a Sixth Amendment right to appointed counsel when she is sentenced to a suspended term of imprisonment and a probationary sentence. *Shelton*, 535 U.S. at 662. Therefore, even though Plaintiffs were initially only sentenced to probation, in effect, the municipal court deferred imposing an imprisonment sentence subject to the "probation sentence." There is substantial evidence in the record that the court generally discussed the right to counsel in its opening remarks at the beginning of a court session. But in their affidavits, Plaintiffs have presented evidence that they were not informed of their right to counsel. (Docs. # 183-8 at 101-02, 105, # 183-27 at 268-69).

In addition to their initial appearances in court, the record shows that, after being summoned to court, Woods was threatened with jail if she failed to pay her fine. (Doc. # 183-8 at 115). Magistrate Seale testified that if a defendant could not pay a fine in full the normal procedure was to sentence them to either probation with JCS or to jail. (Doc. # 183-1 at 121-23). Douglas was actually jailed for failing to comply with the terms of her probation. Neither Woods

nor Douglas thought they needed counsel, and both of them signed waivers of counsel in the Probation Orders. But because both of them potentially faced incarceration, the court had an obligation to conduct an inquiry as to whether their waiver of counsel was knowing and voluntary. *Montejo*, 556 U.S. at 786.

Although this obligation falls squarely on the court, there is evidence in this case that JCS and the municipal court agreed that JCS would be directly involved in obtaining waivers of counsel. JCS prepared the preprinted Probation Orders containing the waiver. (Docs. # 158 at 99-100, # 167 at 6). The record evidence can be reasonably viewed as showing that Judge Atchison pre-signed the Orders, and that after he announced a sentence, the rest of the Order was filled out by JCS. (Doc. # 158 at 99-100). The Rule 56 evidence would permit the trier of fact to find that JCS was responsible for obtaining Plaintiffs' signatures on the document, including the waiver of counsel section. And, based on this evidence, a reasonable juror could find that there was an agreement between the municipal court and JCS to obtain the waivers without any meaningful (and required) judicial inquiry into whether that waiver was knowing and voluntary, and that this agreement caused a constitutional violation. Accordingly, Plaintiffs have presented a triable § 1983 conspiracy claim for the denial of their Sixth Amendment right to counsel.

## IV.    Conclusion

For all of the foregoing reasons, JCS's Motion for Summary Judgment (Doc. # 181) is due to be granted in part and denied in part. A separate order will be entered.

DONE and ORDERED this June 5, 2019.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE